JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

JOHN S. MOST, Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-616-3353 || 202-305-0506 (fax)
John.Most@usdoj.gov

*Counsel for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

_____

|  |  |
|---|---|
| CITIZENS FOR CLEAN ENERGY *et al.* | ) | CV 17-30-BMM |
|  | ) | (lead consolidated case) |
| and | ) |  |
|  | ) |  |
| THE NORTHERN CHEYENNE TRIBE, | ) |  |
|  | ) | **FEDERAL DEFENDANTS'** |
| Plaintiffs, | ) | **REPLY IN SUPPORT OF** |
| v. | ) | **CROSS-MOTION FOR** |
|  | ) | **SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF THE | ) |  |
| INTERIOR *et al.* | ) |  |
|  | ) |  |
| Federal Defendants, | ) |  |
| and | ) |  |
|  | ) |  |
| STATE OF WYOMING *et al.*, | ) |  |
|  | ) |  |
| Intervenor-Defendants. | ) |  |

_____

|  |  |
|---|---|
| STATE OF CALIFORNIA *et al.* | ) | CV 17-42-BMM |
| v. | ) | (consolidated case) |

UNITED STATES DEPARTMENT OF THE )
INTERIOR *et al*. )
)
        Federal Defendants, )
)
   and )
)
STATE OF WYOMING *et al.*, )
)
       Intervenor-Defendants. )
_____ )

## TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................4

    I.    Plaintiffs' Claims are Not Justiciable....................................4

    II.   Plaintiffs' NEPA Claims Lack Merit ....................................9

    III.  Plaintiffs' FLPMA and MLA Claims Lack Merit ..............17

    IV.  Federal Defendants have not Violated Any Trust Obligation to the Northern Cheyenne Tribe ............................................18

CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ....................................................................... 4, 5, 6

*Andrus v. Sierra Club*,
442 U.S. 347 (1979) ...............................................................................11

*Baker v. Carr*,
369 U.S. 186 (1962) .................................................................................5

*Bennett v. Spear*,
520 U.S. 154 (1997) .............................................................................4, 7

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
575 F.3d 999 (9th Cir. 2009) .................................................................16

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
632 F.3d 1072 (9th Cir. 2011) ...............................................................15

*Columbia Riverkeeper v. U.S. Coast Guard*,
761 F.3d 1084 (9th Cir. 2014) .................................................................9

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) .............................................................................5

*Havasupai Tribe v. Provencio*,
No. 15-15754, 2018 WL 5289028 (9th Cir. Oct. 25, 2018).....................9

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) .................................................................................5

*Lance v. Coffman*,
549 U.S. 437 (2007) .................................................................................5

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..........................................................................4, 5, 7

*N. Cheyenne Tribe v. Hodel*,
851 F.2d 1152 (9th Cir. 1988)..........................................................17, 18

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir.1995)...................................................................11

*Noel v. City of Seattle*,
   No. C05-1367-MJB, 2006 WL 2794305 (W.D. Wash. Sept. 27, 2006)...............6

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ........................................................................6

*Pit River Tribe v. U.S. Forest Serv.*,
   469 F.3d 768 (9th Cir. 2006)...................................................... 15, 19

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................7

*United States v. Jicarilla Apache Nation*,
   564 U.S. 162 (2011) ......................................................................19

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
   921 F.2d 232 (9th Cir. 1990)...........................................................11

*W. Org. of Res. Councils v. Zinke*,
   892 F.3d 1234 (D.C. Cir. 2018) ..................................................... 1, 16

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ........................................................................8

*WildEarth Guardians v. U.S. Dept of Agric.*,
   795 F.3d 1148 (9th Cir. 2015) ..........................................................4

**Statutes**

5 U.S.C. § 702 ....................................................................................20

5 U.S.C. § 704 ......................................................................................7

30 U.S.C. § 201(a) ..............................................................................17

30 U.S.C. § 201(a)(1) ..........................................................................17

42 U.S.C. § 4332(2)(C) .................................................................... 9, 10

**Rules**

Fed. R. Civ. P. 15 .................................................................................2

**Regulations**

40 C.F.R. § 1508.18 ........................................................................ 9, 10

40 C.F.R. § 1508.23 ............................................................................10

40 C.F.R. § 1508.27 ...................................................................... 10, 13

Federal Defendants file this reply in support of their cross-motion for summary judgment.  ECF Nos. 123 (motion), 124 (supporting memorandum) ("Mem.").

## **INTRODUCTION**

The complaints in these actions challenge an order by Secretary Zinke (Secretarial Order ("SO") 3348), which ended a "pause" in the agency's processing of most new coal lease applications.  *See* ECF No. 1 at 25 (CV 17-42-BMM) (State Plaintiffs), ECF No. 1 at 34 (CV 17-30-BMM) (Tribe and Conservationists).  That pause had been instituted by former Secretary Jewell in SO 3338, even though the Mineral Leasing Act ("MLA") and its regulations contemplate that such processing will occur.  Both complaints ask the Court, as to remedy, to enjoin further coal leasing pending completion of a programmatic analysis under the National Environmental Policy Act ("NEPA").  *Id.*  However, as Defendants discussed in their opening briefs, two District of Columbia courts have held that such analysis is not required by law and this Court should do the same.[1]

Despite Plaintiffs' original pursuit of programmatic NEPA analysis, the relief they now seek deviates from what was pled and then argued in the opening briefs.  In seeming lockstep, each reply brief concludes by asking only that the

---

[1] *See W. Org. of Res. Councils v. Zinke* (*WORC*), 892 F.3d 1234 (D.C. Cir. 2018); *W. Org. of Res. Councils v. Zinke*, 124 F. Supp. 3d 7 (D.D.C. 2015).

Court reinstate the pause itself, without mention of the NEPA analysis originally prayed for, even though neither prayer for relief sought a pause simply for the sake of a pause and neither requested reinstatement of SO 3338.[2]  The Court should reject this untimely and improper attempt to avoid the D.C. rulings by effectively amending their pleadings without leave of court in contravention of Rule 15.  Fed. R. Civ. P. 15.

Even though Plaintiffs have abandoned pursuit of programmatic analysis, they have no misgivings about citing the lack of such analysis as the legal harm supporting their standing.  Nor do they hesitate to cite it as the legal violation necessary to state a proper Administrative Procedure Act ("APA") claim.  Yet they seek a remedy divorced from the alleged error.  They claim harm from a NEPA violation (failure to prepare a programmatic analysis) and demand indefinite cancellation of lease application processing for no apparent purpose and despite the fact that the MLA contemplates that application processing will occur.

Even if legal error has occurred (and Federal Defendants do not concede any has), the appropriate remedy to redress Plaintiffs' alleged harm would be remand to the Secretary and the Bureau of Land Management ("BLM") without vacatur for programmatic analysis and a new decision, not the sledgehammer of an order

_____

[2] *See* ECF No. 129 at 21, ECF No. 130 at 34 (seeking only reinstatement of the pause); *cf*. ECF No. 116 at 21-22, ECF No. 118 at 40 (opening briefs seeking reinstatement *until NEPA compliance occurs*).

imposing a pause on coal leasing of unlimited duration with no objective.  The latter bears no relation to SO 3338's purpose: conducting a programmatic study to assist Interior in considering possible reform.  The pause was simply a means to that end, not the end in itself.

Most importantly, the Court need not consider remedy at all because it should dismiss Plaintiffs' claims for lack of jurisdiction.  The jurisdictional arguments of both plaintiff groups hinge entirely on a recurring fallacy: that the decision to end the pause impacts the environment.[3]  These allegations misstate the real effect of SO 3348, which authorizes no ground disturbance or other impactful activity.  Instead it simply restores, without change, the recently-disrupted MLA regimen, under which (i) operators may apply to lease coal; and (ii) the agency must then act on those applications in compliance with NEPA.

For all these reasons, and because Plaintiffs' claims lack merit, the Court should enter judgment for Defendants as a matter of law.

---

[3] *See, e.g.,* ECF No. 118 at 13 (contending SO 3348 "authorizes new coal leasing" that will cause various ecologic harms); ECF No. 130 at 15 (referring to "concrete" environmental consequences); ECF No. 116 at 19 (contending "restart[]" of the federal coal program causes "climate change impacts," "harm to public lands and wildlife," and "air quality [and other] impacts").

**ARGUMENT**

**I.     Plaintiffs' Claims are Not Justiciable.**

In their opening brief, Federal Defendants explained that Plaintiffs had failed to demonstrate standing under *Lujan v. Defenders of Wildlife* (*Defenders*), 504 U.S. 555, 560-61 (1992); that their claims are unripe, *see Abbott Laboratories v. Gardner (Abbott)*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977); and that Plaintiffs had failed to identify "final agency action," that is, action which marks the "'consummation' of the agency's decision-making process," and "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

The State Plaintiffs argue as to standing that they are harmed by air pollution resulting from the transport and export of federal coal in their sovereign territories and by climate impacts resulting from increased greenhouse gas emissions.  ECF No. 129 at 2.  The Tribe and Conservationists point to diminished enjoyment of their lands as a result of mining on nearby federal lands that they incorrectly assert is authorized by SO 3348.  ECF No. 130 at 6.  While these allegations may satisfy the "geographic nexus" requirement in a challenge to a coal leasing decision or a mining plan approval, or even to the "predator damage control" program at issue in *WildEarth Guardians v. U.S. Department of Agriculture*, 795 F.3d 1148, 1152 (9th

Cir. 2015), on which the Tribe and Conservationists rely, they are not sufficient here where the purported injuries are remote in time and uncertain and where substantial agency NEPA analysis and decision making, and numerous other intervening events and third party action, must occur before any activity, environmentally damaging or otherwise, may commence.

Plaintiffs have not satisfied the threshold requirement that they show "a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204 (1962), distinct from a "generally available grievance about government." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (*per curiam*).  In reaffirming this principle, the Supreme Court observed in June that this threshold requirement "'ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013)).  In short, Plaintiffs fail to identify a threat of imminent harm and a causal connection sufficient to support their standing.  *Defenders*, 504 U.S. at 560-61 (requiring injury that is "imminent," not "conjectural or hypothetical," and that is "fairly traceable" to the challenged action).

This same deficiency defeats Plaintiffs' arguments founded on ripeness, a doctrine that serves to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way

by the challenging parties." *Abbott*, 387 U.S. at 148-49.  No administrative

decision that would produce the harm of concern to Plaintiffs has occurred yet.  In

fact, Plaintiffs fail to identify any "concrete way" in which they feel the effects of

S.O 3348.  *Id.*  Further, it is clear that SO 3348 imposes no "direct and immediate"

hardship on Plaintiffs or their members.  *Id.*; *see also Noel v. City of Seattle*, No.

C05-1367-MJB, 2006 WL 2794305, at *7 (W.D. Wash. Sept. 27, 2006) (an order

denying judicial review "is not a hardship to any party in that it will not create a

direct and immediate dilemma for [plaintiff] because actual construction . . . will

not begin until after funding is secured and the federal and state permits have been

obtained)."

   Plaintiffs argue that Federal Defendants ignore the procedural nature of their

NEPA violation, ECF No. 130 at 10, and the Supreme Court's holding that a claim

of procedural injury arises when the "failure takes place," *Ohio Forestry Ass'n v.

Sierra Club*, 523 U.S. 726, 737 (1998), but the argument is unavailing for two

reasons.  First, the statement in *Ohio Forestry* on which Plaintiffs rely expressly

limits its application to "person[s] *with standing*" who are "injured by a failure to

comply with the NEPA procedure."  *Id.* (emphasis added).  Thus, standing is an

assumed element of the holding Plaintiffs rely on.  Further, *Ohio Forestry* does

not, as Plaintiffs imply, hold that any citizen, anywhere, can satisfy the ripeness

requirement simply by asserting a claim that a procedural failure has occurred and

that it "can never get riper." *Id*.  A plaintiff must still be threatened with harm to his or her concrete interests.

Second, the argument is unavailing because, eleven years after its decision in *Ohio Forestry*, the Supreme Court made abundantly clear that "deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Plaintiffs' reliance on a supposed procedural injury is unavailing where that injury is not accompanied by some harm to a concrete interest, harm that the standing jurisprudence counsels must be "imminent." *Defenders*, 504 U.S. at 560.  And of course, that deficiency is exacerbated by the fact that Plaintiffs have abandoned their pursuit of a programmatic analysis.  In sum, Plaintiffs fail to demonstrate a justiciable challenge, founded on imminent injury that is ripe for judicial consideration and fairly traceable to SO 3348.  Their claims should be dismissed.

Plaintiffs' claims should also be dismissed because they fail to state a cause of action under the APA: specifically, Plaintiffs fail to identify any final agency action by which they are aggrieved.  5 U.S.C. § 704.  In their opening brief, Federal Defendants explained that agency action is "final" if (1) it "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) is "one by

which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78 (citation omitted).

The State Plaintiffs argue in reply that issuance of SO 3348 marked the "conclusion of the agency's decisionmaking process with regard to the federal coal moratorium and the programmatic EIS." ECF No. 129 at 10. This may be so, given how narrowly the State Plaintiffs have qualified the statement, but it is undisputed that further agency decision making and independent action of third parties is required before any coal leasing could occur, a point Federal Defendants addressed in detail in their opening brief.[4]

The Tribe and Conservationists argue, in similarly qualified language, that SO 3348 was the "final word" in Federal Defendants' deliberations on "whether to terminate the . . . moratorium," ECF No. 130 at 11-12. Here again, what matters under the first prong of the finality test is whether SO 3348 constitutes the "last word" on any particular coal leasing action – and it does not. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

---

[4] *See* ECF No. 124 at 17-18 (discussing intervening steps of NEPA analysis; fair market value determination; conducting of a lease sale, which includes a high-bidder eligibility determination; permitting under the Surface Mining Control and Reclamation Act (SMCRA); development of a mining plan by the operator, working in conjunction with the SMCRA permitting authority (most commonly a state authority); further environmental analysis and recommended approval of a mining plan by Interior's Office of Surface Mining Reclamation and Enforcement; and approval of a mining plan by the Secretary or Assistant Secretary, as the MLA requires).

As to the second prong, both plaintiff groups argue that "rights and obligations" have been determined and that "legal consequences will flow" because lifting the pause clears the way for – and makes possible – the processing of lease applications.  ECF Nos. 129 at 11, 130 at 13-14.  But the same argument could be made as to any interlocutory step in an agency administrative process. What is determinative is the fact that the decision has no "practical effect" on Plaintiffs.  *See Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014) (noting that the court looks to the practical effect of a decision in assessing whether a claim is ripe).  And unlike the "valid existing rights" determination in *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1162 (9th Cir. 2018) – which formally determined that a certain land claim under the Mining Law of 1872 had been properly perfected (thus rendering that claim exempt from the Secretary's decision to close certain lands to prospecting under the Mining Law) – SO 3348 makes no decision affecting public lands or the rights of claimants or that has any effect at all on Plaintiffs.  The Court should dismiss Plaintiffs' claims as a matter of law.

## II.   Plaintiffs' NEPA Claims Lack Merit.

Federal Defendants' opening brief explained that the order challenged in these cases does not meet the regulatory definition of "major Federal action" under NEPA, ECF No. 124 at 27 (citing 42 U.S.C. § 4332(2)(C)), so as to require

preparation of a programmatic EIS.  Federal Defendants discussed the regulatory definition of "Major federal action" in 40 C.F.R. § 1508.18, and noted its reference to 40 C.F.R. § 1508.27, listing the "intensity" factors that guide agencies in determining whether an EIS is required.  They discussed the definition of "proposal" in 40 C.F.R. § 1508.23, since NEPA itself only mandates preparation of EISs once "*proposals* for legislation and other major Federal actions" have been made.  42 U.S.C. § 4332(2)(C) (emphasis added).  And they also pointed out that Plaintiffs' opening briefs did not address these regulations.

In reply, Plaintiffs decline the challenge.  The Tribe and Conservationists, for their part, ignore the regulations altogether.  The State Plaintiffs cite only a portion of 40 C.F.R. § 1508.18, one of merely tangential relevance in which the Council on Environmental Quality ("CEQ") identified certain types of "[a]ctions" potentially subject to NEPA, including projects and programs, rules, and legislative proposals.  Neither plaintiff group makes any attempt to explain in regard to the "intensity" factors why the action challenged here is significant and demands an EIS, other than to incorrectly state that SO 3348 authorizes leasing.

It is anomalous that such sophisticated environmental litigants challenging agency action as unlawful due to lack of NEPA analysis would make no attempt to identify, either in the Act itself or its implementing regulations, some provision supporting their view that an administrative decision of this sort amounts to major

10

federal action requiring an EIS.  But the fact is they identify no such provision –
and the provisions discussed in the briefing that do bear on the question support the
conclusion that an EIS is *not* required.  Instead Plaintiffs point to the contrast
between the current administration's view of coal management and the former
administration's view.  *See* ECF No. 130 at 16 (stating that under SO 3338, "no
new coal-leasing could occur"); ECF No. 129 at 15 (stating that, but for SO 3348,
a moratorium "would remain").  But this emphasis on the contrast between the
policies of the two administrations is unavailing for several reasons.

First, the pause instituted by SO 3338 constituted only a temporary
disruption of the MLA lease-processing regimen, under which operators ordinarily
may apply to lease coal and BLM must act on those applications.  The purpose of
the pause was to facilitate preparation of a programmatic EIS that would assist in
considering possible program reform, but as SO 3348 pointed out, an EIS is not the
only possible way of considering reform.  AR 1.  More importantly, it makes no
sense to elevate SO 3338 to the status of a settled legal regimen and then declare
SO 3348 an unexplained departure therefrom, where the latter simply restores the
status quo ante.  The Ninth Circuit has made clear that "where a proposed federal
action would not change the status quo, an EIS is not necessary."  *Upper Snake
River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990);
*Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1344 (9th Cir. 1995) ("[d]iscretionary

11

agency action that does not alter the status quo does not require an EIS"); *see also Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979) ("'major Federal actions' include the 'expansion or revision of ongoing programs'") (quoting S. Rep. No. 91–296, p. 20 (1969)). Here, no aspect of the federal coal program is being expanded or revised and the challenged order simply reinstates the true status quo, not the temporary aberration that SO 3338 represented and that Plaintiffs now insist constitutes the new status quo.[5]

Second, even if the Court accepts the theory that SO 3338 created a new legal regimen and that SO 3348 represents a departure, an EIS is still not required because, as noted, no proposal for a major federal action significantly affecting the quality of the human environment exists. Indeed, SO 3348 has no immediate ecologic effect of any sort. Further, because the coal program has already been

---

[5] In their reply briefs, Plaintiffs press this contention that SO 3348 represents an unexplained – and therefore arbitrary – departure from SO 3338. Federal Defendants addressed that argument in their opening brief, ECF No. 124 at 32-36, and need not restate it here except to emphasize that SO 3338 nowhere states that a moratorium or PEIS was necessary, as Plaintiffs argue. In fact, Secretary Jewell never used the term "necessary" or anything akin to it in her order. Rather, the order explained that preparation of a "discretionary [PEIS]" would "help determine whether and how the current system for developing Federal coal should be modernized." AR 3. In SO 3348, the new administration correctly explained that a programmatic EIS is not "required to consider potential improvements to the program." AR 1. In short, the previous administration never determined that a programmatic EIS was necessary or legally required, only that it would be helpful, and the new administration did not make an unexplained reversal when it chose, as it may do, to abandon a discretionary study and state the reasons why.

studied in a programmatic EIS, and because no changes to that program have been proposed, Plaintiffs' claim that the agency erred by failing to prepare a programmatic EIS is not supported by any legal authority.  All Plaintiffs can point to in support of their claim is a contrast with the temporary regimen of SO 3338, but this is not something for which the law or agency guidance demands an EIS.[6]

Notably, the CEQ regulations provide guidance to agencies in determining whether an EIS is required.  *See* 40 C.F.R. § 1508.27.  As discussed, the regulation

---

[6] The action challenged here is not at all similar to the types of actions that, according to the BLM handbook, normally require an EIS.  *See* Ex. 1.  Section 7.2 lists the following:

(1) Approval of Resource Management Plans;
(2) Proposals for Wild and Scenic Rivers and National Historic Scenic Trails;
(3) Approval of regional coal lease sales in a coal production region;
(4) Decision to issue a coal preference right lease;
(5) Approval of applications to the BLM for major actions in the following categories:
    (a) Sites for steam-electric power plants, petroleum refineries, synfuel plants, and industrial structures
    (b) Rights-of-way for major reservoirs, canals, pipelines, transmission lines, highways and railroads;
(6) Approval of operations that would result in liberation of radioactive tracer materials or nuclear stimulation;
(7) Approval of any mining operation where the area to be mined, including any area of disturbance, over the life [of] the mining plan is 640 acres or larger in size.

Notably, other actions, including coal leasing decisions, are frequently supported by EISs, but agency regulations specifically allow for the possibility that an EA, accompanied by a Finding of No Significant Impact, would be sufficient to approve issuance of a coal lease.

identifies ten intensity factors for agencies to consider in determining whether a

proposed action is significant for purposes of NEPA and thus requires an EIS.

These include consideration of:

> (1) effects that may be both beneficial and adverse;
> (2) the degree to which the action would affect public health and safety;
> (3) unique characteristics of the geographic area;
> (4) the degree to which the effects are likely to be highly controversial;
> (5) the degree to which effects are highly uncertain or involve unique or unknown risks;
> (6) whether the action may establish a precedent for future actions with significant impacts;
> (7) whether the action is related to other actions with cumulatively significant impacts;
> (8) the presence of scientific, cultural, or historical resources, including those listed in or eligible for listing in the National Register of Historic Places;
> (9) the degree to which the action would adversely affect species listed under the Endangered Species Act or their designated critical habitat; and
> (10) any effects that threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment, such as the Clean Air Act or the Clean Water Act.

*Id*. § 1508.27(b).  The factors set out above plainly relate to on-the-ground

ecologic impacts of proposed federal actions, but none of them is implicated by, or

has any logical bearing on, an administrative decision to resume processing of

applications, subject to full NEPA analysis.  Tellingly, neither plaintiff group

mentions the intensity factors, even though it is standard practice for

environmental plaintiffs, in litigation over whether an EIS was required, to invoke

and discuss the factors and despite the fact that the regulatory definition of "major

federal action" refers to those factors.

Plaintiffs' inadequate showing with respect to NEPA and its implementing regulations is not aided by the case law they discuss in their respective replies. None of the cases Plaintiffs cite in support of their position addresses the specific circumstances at issue here. Instead, Plaintiffs attempt to analogize those rulings to the facts of this case, but the comparisons are strained and the results unconvincing. In *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768 (9th Cir. 2006), for example, expiring geothermal leases issued in June 1988 were extended in May 1998 by the Forest Service, without NEPA analysis. Plaintiffs liken this extension to the lifting of the pause in these cases, but in *Pit River Tribe,* the impacts of leasing had not been studied either for the 1988 issuance or the 1998 extension. *Id.* at 775-76. Further, SO 3348 does not approve any leases, but rather simply allows *consideration* of whether to approve leases.

Similarly, in *California Wilderness Coalition v. U.S. Department of Energy*, 631 F.3d 1072 (9th Cir. 2011), the agency concluded, without study or explanation, that the effects of its action (i.e., approval of two "national interest electric transmission corridors") would not be significant. The action here is to reinstate the MLA regimen by resuming consideration of applications to approve leases. The case is also unavailing because no NEPA analysis of the decision to approve the transmission corridors was performed at all, whereas here the effects of the program have already been studied and no regulatory changes are proposed.

15

Plaintiffs' further reliance on *California ex rel. Lockyer v. U.S. Department of Agriculture*, 575 F.3d 999 (9th Cir. 2009), is also unavailing. The previously effective management constraint that the challenged action supplanted – without NEPA analysis – included substantive environmental protections that had been duly adopted through APA rulemaking and thus had the force of law. The court faulted the agency for failing to perform NEPA analysis when it promulgated a new final rule that reduced those substantive protections. These circumstances bear no similarity to the facts of this case.

Finally, both plaintiff groups argue that the D.C. Circuit's recent ruling in *WORC*, 892 F.3d 1234 – the only case Plaintiffs identify with any noteworthy similarities to this case – has no bearing here. They point to the fact that *WORC* involved a challenge under APA section 706(1), seeking to compel agency action unlawfully withheld or unreasonably delayed, whereas this case involves a challenge under APA section 706(2), asserting that the decision to lift the pause was arbitrary for failure to prepare an EIS. This is a distinction without a difference. In rejecting plaintiffs' claims in *WORC*, the D.C. Circuit held that a programmatic EIS was not required because no "major Federal action," such as a change to the 1979 rules establishing the modern coal program, had been proposed. *Id.* at 1245. This remains true today. Despite the filing of four lengthy summary judgment briefs in these actions, Plaintiffs fail to demonstrate major federal action

16

of any kind – let alone a major federal action that would trigger revisiting the viability of the programmatic EIS underlying the 1979 rules.[7]

## III.   Plaintiffs' FLPMA and MLA Claims Lack Merit.

In their opening brief, Federal Defendants explained that the MLA provision at 30 U.S.C. § 201(a) relating to consideration of the public interest has no application to SO 3348 because it applies at the leasing stage, not at this preliminary stage, and because it relates to how tracts of federal coal are divided for leasing. ECF No. 124 at 36-37. Federal Defendants' argument was supported by the plain language of the statute, which states that the Secretary is "authorized to divide any lands subject to this chapter which have been classified for coal leasing into leasing tracts of such size as he finds appropriate and in the public interest . . . ." 30 U.S.C. § 201(a)(1).

In reply, the State Plaintiffs contend the provision is applicable because SO 3348 is "linked to leasing," even though, as the State Plaintiffs concede, "the order does not authorize any site-specific coal leases." ECF No. 129 at 18. In support, Plaintiffs cite the fact that SO 3338 "discussed concerns related to the public

---

[7] The Northern Cheyenne Tribe also argues that Federal Defendants failed to consider the impacts of SO 3348 on the Tribe and its lands and resources, something the agency must do in the case of a proposed major federal action. But here, no such action has been proposed. Plaintiffs' position is not aided by the ruling in *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152 (9th Cir. 1988), because that case involved an actual leasing decision, supported by an EIS that did not examine tribal impacts.

17

interest," *id*., but a careful review of that order reveals no mention of the "public interest."  AR 3-20.  Although Secretary Jewell did discuss "providing a fair return to American taxpayers," as Plaintiffs note, ECF No. 129 at 18, their attempt to corral this concept within the ambit of the "public interest" is of no assistance where the MLA's public interest provision relates only to how lands are divided for leasing.  Plaintiffs' MLA argument should be rejected, as should their arguments under the Federal Land Policy and Management Act ("FLPMA"), which fail to demonstrate that the agency violated any statutory mandate, since the FLPMA provisions Plaintiffs cite relate to land use planning, they are hortatory in nature, and they provide no standards by which compliance may be measured.  As Federal Defendants explained in their opening brief, ECF No. 124 at 38-39, the challenged order does not involve land use planning, but instead involves an expression of policy relative to implementation of the MLA.  The Court should reject these claims.

### IV.   Federal Defendants have not Violated any Trust Obligation to the Northern Cheyenne Tribe.

Plaintiffs contend the Secretary violated his trust obligation to the Northern Cheyenne Tribe "by issuing [SO 3348] in violation of NEPA."  ECF No. 118 at 37.  The argument fails, as Federal Defendants explained in their opening brief, because no major federal action has been proposed and thus no NEPA violation has occurred.  More importantly, the argument fails because Plaintiffs do not

identify any statute or regulation that creates a specific obligation that Federal

Defendants have violated. *United States v. Jicarilla Apache Nation*, 564 U.S. 162,

165 (2011) (explaining that the Secretary's trust obligations are "established and

governed by statute rather than the common law" and noting that the Secretary

incurs specific fiduciary duties toward particular Indian tribes when it manages or

operates Indian lands or resources).  Plaintiffs' reliance on *Pit River Tribe* is

unavailing because the case, as discussed, involved issuance and extension of

geothermal leases without any analysis under NEPA or the National Historic

Preservation Act ("NHPA") on the effect of those leases.  469 F.3d at 775-76.  The

NEPA and NHPA violations were thus readily apparent.  Plaintiffs quote a passage

in which the Ninth Circuit stated that "the agencies [had] violated their minimum

fiduciary duty to the Pit River Tribe when they violated the statutes," ECF No. 130

at 30, but they omit the very next sentence in which the court added, by way of

further explanation, that it "therefore need not reach any of the other fiduciary duty

arguments raised by Pit River."  *Pit River Tribe*, 469 F.3d at 788.  Thus, as relevant

here, *Pit River Tribe* stands not for the proposition that some "general trust

obligation" exists apart from statute, ECF No. 130 at 30, but rather only for the

proposition that a failure to consider tribal and cultural impacts in an EIS violates

the government's duties under NEPA and NHPA.  Where no statutory violation

has occurred, the government cannot be said to have violated its trust obligations.

19

## CONCLUSION

For the foregoing reasons, Federal Defendants ask that the Court dismiss Plaintiffs' claims, deny their motions for summary judgment, grant Defendants' cross-motions, and enter judgment in favor of all Defendants.  Should the Court conclude that a legal violation has occurred, the appropriate remedy would be remand without vacatur for further analysis and a new decision.  Contrary to Plaintiffs' assertion, ECF No. 130 at 32, an order of vacatur is not the default remedy.  If a court finds legal error in an APA case, it must take the equities into account in its remedy decision regardless of whether the plaintiff seeks an injunction or an order of vacatur.  5 U.S.C. § 702.

Respectfully submitted this 16th day of November, 2018.

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

 /s/ John S. Most
JOHN S. MOST, Trial Attorney
Natural Resources Section
P.O. Box 7611, Washington, D.C. 20044
202-616-3353 || 202-305-0506 (fax)
John.Most@usdoj.gov

*Counsel for Federal Defendants*

Of Counsel:

Briana W. Collier
Office of the Solicitor
U.S. Department of the Interior

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing is being filed with the Clerk of the Court using the CM/ECF system, thereby serving it on all parties of record on November 16, 2018.

/s/ *John S. Most*
JOHN S. MOST
*Counsel for Defendants*

21