ROGER SULLIVAN
DUSTIN LEFTRIDGE
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 1st Ave. E.
Kalispell, Montana 59901-5341
(406) 752-5566
RSullivan@McGarveyLaw.com

XAVIER BECERRA
Attorney General of California
DAVID ZONANA
Supervising Deputy Attorney General
GEORGE TORGUN (*pro hac vice*)
CA Bar No. 222085
ELIZABETH B. RUMSEY (*pro hac vice*)
CA Bar No. 257908
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-1002
E-mail: George.Torgun@doj.ca.gov

[*Additional counsel listed on signature page*]

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## GREAT FALLS DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF NEW MEXICO; STATE OF NEW YORK;** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**DAVID BERNHARDT,** in his official capacity as Secretary of the Interior; **UNITED STATES BUREAU OF LAND MANAGEMENT**; and **UNITED STATES DEPARTMENT OF THE INTERIOR,**<br><br>Defendants. | Case No. 4:17-cv-30-BMM [Lead]<br><br>Consolidated with:<br><br>Case No. 4:17-cv-42-BMM<br><br>**FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Mineral Leasing Act, 30 U.S.C. § 181 *et seq.*; Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*) |

**INTRODUCTION**

1.     In this action, the State of California, by and through Xavier Becerra, Attorney General; the State of New Mexico, by and through Hector Balderas, Attorney General; the State of New York, by and through Letitia James, Attorney General; and the State of Washington, by and through Robert W. Ferguson, Attorney General ("Plaintiffs") challenge a decision by Defendants David Bernhardt, United States Bureau of Land Management ("BLM"), and the United States Department of the Interior (collectively, "Defendants") to restart the federal coal leasing program based on an inadequate and overly narrow environmental review that fails to assess the environmental impacts of the program, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. Plaintiffs also challenge BLM's decision to restart the federal coal leasing program without evaluating whether the program is in the public interest or ensuring that it will provide fair market value to the public, in violation of the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181 *et seq*., and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*.  Plaintiffs file this First Supplemental Complaint pursuant to Federal Rule of Civil Procedure 15(d) to raise allegations based on events that have occurred since Plaintiffs filed their original Complaint on May 9, 2017, ECF No. 1 in Case No. 4:17-cv-42-BMM, and hereby incorporate by reference the factual and legal allegations in that Complaint.

2.     On April 19, 2019, this Court held that the issuance of Secretarial Order 3348 in March 2017 by then-Secretary of the Interior Ryan Zinke restarting the federal coal leasing program constituted a major federal action requiring compliance with NEPA.  *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264 (D. Mont. 2019) ("*Citizens*").  On February 26, 2020, Defendants issued a Final Environmental Assessment entitled "Lifting the Pause on the Issuance of New Federal Coal Leases for Thermal (Steam) Coal" ("Final EA"),

and a Finding of No Significant Impact ("FONSI"), to allegedly respond to the Court's decision.

3.    However, in violation of the fundamental requirements of NEPA, the Final EA and FONSI make no effort to take a "hard look" at the environmental impacts of Defendants' decision to open up tens of thousands of acres of public lands to coal leasing and development.

4.    In particular, the Final EA arbitrarily limits the scope of its analysis to just four leases that were issued since March 2017, representing just a tiny fraction of the more than 300 existing leases and pending lease applications under the restarted coal leasing program.  The Final EA also considers an extremely narrow range of "issues" related to these four leases, limiting its discussion to greenhouse gas emissions, socioeconomic impacts, and impacts to water quality, quantity, and riparian areas.  In doing so, Final EA ignores many of the impacts and concerns that warrant consideration in an updated environmental review of the program, such as harm to public lands and wildlife from coal mining, air quality impacts from coal transport and combustion, the disposal of coal ash, which contains hazardous constituents, as well as environmental justice impacts related to such activities. Further, the Final EA's failure to consider any alternatives other than its so-called "no action" alternative or the proposed action (*i.e.*, Secretarial Order 3348), including those suggested by commenters and BLM itself, violates NEPA's mandate to consider a reasonable range of alternatives and is arbitrary and without basis in fact.

5.    Furthermore, the issuance of the Final EA and FONSI did not address or otherwise seek to remedy Defendants' violations of the MLA and FLPMA in restarting the federal coal leasing program.  Specifically, Defendants continue to violate the MLA and FLPMA by failing to ensure that the program both serves the

public interest and provides a fair market return to the public from the sale of public resources.

6.    Accordingly, Plaintiffs seek a declaration that Defendants' issuance of Secretarial Order 3348 violated NEPA, the MLA, FLPMA, and the APA.  Plaintiffs request that the Court vacate and set aside Secretarial Order 3348, as well as the Final EA and FONSI, and reinstate the prior Secretarial Order placing a moratorium on new federal coal leasing unless and until Defendants comply with applicable law.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (APA).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

8.    Defendants' issuance of Secretarial Order 3348 on March 29, 2017 restarting the federal coal leasing program constitutes final agency action and is therefore judicially reviewable within the meaning of the APA.  5 U.S.C. §§ 704, 706; *see Citizens*, 384 F. Supp. 3d at 1280.  In addition, Defendants' issuance of a Final EA and FONSI on February 26, 2020 is a final agency action and is therefore judicially reviewable within the meaning of the APA.  5 U.S.C. §§ 704, 706.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are officers or employees of the United States or agencies thereof, and federally-owned coal that is subject to the federal coal leasing program lies in this District.

**PARTIES**

10.    Plaintiff State of California brings this action by and through Attorney General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the State, and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12600-12612.  This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of California from pollution, impairment, or destruction.  Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12511, 12600-12612; *D'Amico v. Bd. of Med. Exam'rs*, 11 Cal. 3d 1 (1974).

11.    Plaintiff State of New Mexico brings this action by and through Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the state requires such action.  N.M. Stat. Ann. § 8-5-2.

12.    Plaintiff State of New York is a sovereign entity and brings this action by and through Letitia James, Attorney General, to protect its own sovereign and proprietary rights, and as *parens patriae* on behalf of its affected citizens and residents.  The Attorney General is the chief legal officer of the State of New York. The Attorney General is authorized by both statute and common law to institute such proceedings before state and federal courts, tribunals, and commissions as he or she may deem to be in the public interest.

13.    Plaintiff State of Washington is a sovereign entity and brings this action to protect its sovereign and proprietary rights, and as *parens patriae* on behalf of its affected citizens and residents.  The Attorney General is the chief legal adviser to the State of Washington.  The Attorney General's powers and duties include acting in federal court on matters of public concern.  This challenge is brought pursuant to

the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

14.    Plaintiffs have an interest in the responsible use, management, and conservation of our nation's public resources.  That interest is particularly strong where, as here, the use of such resources causes adverse environmental impacts that the States are working diligently to address.

15.    Plaintiffs have an interest in preventing adverse water quality, air quality, environmental justice, and other impacts from fossil fuel development, transport, and combustion.  For example, millions of tons of coal have been transported through California in open rail cars to ports in Los Angeles, Long Beach, Stockton, and Richmond, areas that are surrounded by low-income and minority communities that are already disproportionately impacted by environmental pollution.  A 2015 study published in the journal Atmospheric Pollution Research found that the passage of a diesel-powered, open-top coal train resulted in nearly twice as much particulate matter emissions as a diesel-powered freight train.  According to a 2017 report by the Bay Area Air Quality Management District, particulate matter emissions from the storage and handling of significant quantities of bulk materials such as coal present an environmental and public health concern because small dust particles cause or contribute to a wide variety of serious health problems, including asthma, bronchitis, cardio-vascular diseases, and cancer.

16.    In addition, coal from federal leases affected by Secretarial Order 3348 is, and would be, transported by rail across Washington.  In particular, coal from the Powder River Basin is shipped to or through the state.  According to the Washington Department of Transportation (WSDOT), in 2016 11.9 million tons of coal shipped to or through Washington in an average of 34 daily freight trains.  WSDOT has projected three different scenarios for coal transportation by 2040, with the high-growth scenario placing coal transportation at 56.7 million tons in 88

daily freight trains and the low-growth scenario placing coal transportation at 5.7 million tons in 28 daily trains.  Among the factors that would lead to the high-growth scenario would be growth in coal exports caused by bulk shipment facilities for coal from the Powder River Basin and Uinta Basin.

17.     Increased transportation of coal through and to Washington would result in a range of harmful impacts, including many that could not be reasonably mitigated. Diesel particulates from transport would increase cancer rates; rail transportation would block traffic at road crossings; transportation would block access to established tribal fishing sites along the Columbia River; rail transportation would contribute to an increase in rail accidents in the state; and water transportation would increase the risks of vessel accidents in the Columbia River. In addition, noise and vibration impacts from rail travel would increase.

18.     Moreover, the release and deposition of coal dust from transport through and to Washington increases a risk of harm to human health and the environment. Coal loaded onto trains consists of pieces and particles of differing size, including small particles, or dust.  Wind and air moving over the train causes coal dust to blow off the rail cars, disperse, and settle onto the ground or water.  Coal dust is also created from the movement and transfer of coal at an industrial facility.  When people or animals inhale particulate matter, cilia and mucus filter larger particles in the nose or throat, but small particles can pass through into the lungs.  The smallest particles can enter the circulatory system, where they harden and inflame the arteries.  Most of the smallest particles are produced by combustion, such as the burning of wood or fossil fuels, although some may also be present in dust, such as road dust and coal dust.  Uncontrolled dust falling into streams and rivers could affect the environment by affecting fish, aquatic resources, water quality, or the shoreline.

19.     Plaintiffs have also long been leaders in working to reduce greenhouse gas ("GHG") emissions and slow the pace of climate change.  Plaintiffs have a significant interest in ensuring that the federal coal leasing program does not undermine those efforts.  As of 2017, GHG emissions from the production, transport, and consumption of federal coal accounted for 11 percent of national GHG emissions, and approximately 1.5 percent of global GHG emissions. Plaintiffs have and will continue to be significantly affected by climate change through adverse impacts such as increased heat waves and greater air pollution, more frequent and intense storms and associated flooding, reduced snowpack and water supplies, increased wildfires, and sea level rise.

20.     For example, Washington experiences many negative effects of climate change, including rising ambient temperatures, a diminished and unpredictable snowpack that is necessary for water consumption and hydropower generation, and ocean warming and acidification, which is harmful to Washington's shellfish. Without greenhouse gas mitigation, the predicted level of ocean acidification along Washington's coast is expected to cause a 34% decline in shellfish survival by 2100.  According to the University of Washington, climate change adversely affects Washington's water resources by decreasing snowpack, increasing stream temperatures, decreasing summer minimum streamflows, and causing widespread changes in streamflow timing and flood risk.  These changes increase the potential for more frequent summer water shortages in some basins (e.g., the Yakima Basin) and for some water uses (e.g., irrigated agriculture or instream flow management), particularly in fully allocated watersheds with little management flexibility.

21.     Washington's forests are likely to experience significant changes in the establishment, growth, and distribution of tree species as a result of increasing temperatures, declining snowpack, and changes in soil moisture.  A rise in forest mortality is also expected due to increasing wildfire, insect outbreaks, and diseases.

Sea level is projected to rise in most coastal and marine areas of the state, increasing the likelihood for permanent inundation of low-lying areas, higher tidal and storm surge reach, flooding, erosion, and changes and loss of habitat. Sea level rise, rising coastal ocean temperatures, and ocean acidification will also affect the geographical range, abundance, and diversity of Pacific Coast marine species.

22.     Climate change is expected to affect both the physical and mental health of Washington's residents by altering the frequency, duration, or intensity of climate-related hazards to which individuals and communities are exposed. Health impacts include higher rates of heat-related illnesses (e.g., heat exhaustion and stroke); respiratory illnesses (e.g., allergies, asthma); vector-, water-, and food-borne diseases; and mental health stress (e.g., depression, anxiety). These impacts can lead to increased absences from schools and work, emergency room visits, hospitalizations, and deaths. In particular, increased forest fire activity in Washington has led to an increase in unhealthy air days, impacting public health.

23.     In response to these impacts from climate change, Washington has enacted statutes and expended significant financial resources to reduce greenhouse gas emissions and slow the pace of climate change.

24.     As a state in the arid southwest, New Mexico is also experiencing the adverse effects of climate change and will suffer additional impacts in the future. Average temperatures in New Mexico have been increasing 50% faster than the global average over the past century. According to the Third U.S. National Climate Assessment, streamflow totals in the Rio Grande and other rivers in the Southwest were 5% to 37% lower between 2001 and 2010 than the 20th century average flows. Projections of further reduction of late-winter and spring snowpack and subsequent reductions in runoff and soil moisture pose increased risks to water supplies needed to maintain cities, agriculture, and ecosystems. Drought and increased temperatures due to climate change have caused extensive tree death

across the Southwest.  Winter warming due to climate change has exacerbated bark beetle outbreaks by allowing more beetles, which normally die in cold weather, to survive and reproduce.  According to a 2015 study by scientists at Los Alamos National Laboratories, greenhouse gas-driven warming may lead to the death of 72 percent of the Southwest's evergreen forests by 2050, and nearly 100% mortality of these forests by 2100.

25.    In response to the dangers posed by greenhouse gases, New Mexico has enacted an Energy Transition Act, which moves the state away from coal by setting standards for utilities of 50% renewable energy by 2030, 80% by 2040, and zero-carbon resources by 2050.

26.    New York also suffers climate change impacts similar to many of those described above.  For example, New York communities and infrastructure have incurred significant damage from heavy rains in recent years.  In addition, New York and other eastern states suffer injury from air quality harms caused by conventional pollutants such as nitrogen oxides that power plants east of the Mississippi River emit when they burn federal coal.  These emissions react in the atmosphere to form ozone and particulate matter that blows into New York and other eastern states and causes and/or exacerbates respiratory illness and premature death.

27.    Plaintiffs have an interest in ensuring that the public receives appropriate compensation when these fossil fuel resources are extracted and produced on public lands.  Defendants' decision to issue an EA and FONSI and restart the federal coal leasing process without addressing the outdated structure for management of federal coal will impact the amount of royalties received by the federal government and states from the extraction of this public resource.  As a result of the adverse impacts from the combustion of federal coal, Plaintiffs and other states and local governments incur costs for health care, water storage and

flood control facilities, infrastructure protection, and other responsive actions. Under the current system of determining the "fair market value" of the leases, BLM does not recoup those costs.

28.     Plaintiffs also rely on Defendants' compliance with the procedural and substantive requirements of NEPA to obtain timely and accurate information about activities that may have significant adverse impacts on public lands and impacts within their States, and to meaningfully participate in decision-making processes. As demonstrated in their existing challenge in this court, Plaintiffs have suffered and continue to suffer a legally cognizable harm because of Defendants' actions, as they have been aggrieved by lack of an adequate environmental review of the federal coal leasing program and the lifting of the leasing moratorium.

29.     Plaintiffs and their residents have repeatedly sought to participate in the environmental review process for the federal coal leasing program.  Most recently, Plaintiffs submitted timely comments during the 15-day comment period on the challenged EA.

30.     In addition, during the scoping process in 2017, which was then halted by Secretarial Order 3348, BLM received comments from more Washington residents than from any other state – 182 out of a total 1239 individual commenters. According to the challenged EA, BLM relied on these comments to justify its decision not to engage in scoping for the EA, demonstrating their continued importance to the current NEPA review.  This participation demonstrates a high degree of concern with adequate environmental review of the federal coal program among Washington residents.

31.     Without the benefit of the "hard look" at the impacts of restarting the federal coal leasing program that a lawful environmental review would provide, Defendants' decision to restart the coal leasing program based on an overly narrow and legally deficient EA does not even acknowledge, let alone address, the harms to

Plaintiffs from this action.  Preparation of an adequate NEPA review that identifies and evaluates those impacts will provide additional information that could result in a different decision regarding the federal coal leasing program – a termination of the program, modification of the program, or other restrictions that would redress Plaintiffs' injuries.  Accordingly, Plaintiffs have standing to bring this action.

32.     Defendant David Bernhardt is Secretary of the Interior and is sued in his official capacity.  Mr. Bernhardt has responsibility for implementing and fulfilling the Department's duties under NEPA and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

33.     Defendant United States Bureau of Land Management is an agency of the United States government that is charged with managing the federal coal leasing program and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

34.     Defendant United States Department of the Interior is an agency of the United States government which oversees the United States Bureau of Land Management and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

## STATUTORY BACKGROUND

### I.     NATIONAL ENVIRONMENTAL POLICY ACT.

35.     NEPA is the "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1.  The fundamental purposes of NEPA are to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id*. § 1500.1(b)-(c).

36.     To achieve these purposes, NEPA requires the preparation of a detailed environmental impact statement ("EIS") for any "major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  In addition to review of site-specific actions, the types of "major Federal action" subject to NEPA review include:

> Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based ... and [a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; [and] systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

40 C.F.R. § 1508.18(b)(2)-(3); *see also id*. § 1502.4(b) ("Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs ... .  Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking").

37.     The Supreme Court has found that a programmatic EIS for the federal coal program is required by NEPA because the program "is a coherent plan of national scope, and its adoption surely has significant environmental consequences."  *Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976).

38.     In an EIS, a federal agency must analyze the direct, indirect, and cumulative impacts of its action.  *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8.  "Direct effects" are those "caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b).  A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can

result from individually minor but collectively significant actions taking place over a period of time." *Id*. § 1508.7. As relevant here, the Ninth Circuit Court of Appeals has found that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1217 (9th Cir. 2008).

39.    As a preliminary step, an agency may first prepare an environmental assessment ("EA") to determine whether the effects of an action may be significant. 40 C.F.R. § 1508.9. An EA must discuss the "environmental impacts of the proposed action" and "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id*. § 1508.9(a)–(b); *see id*. § 1500.1(b). If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons to explain why a project's impacts are insignificant." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Ctr. for Biological Diversity*, 538 F.3d at 1215.

## II.    FEDERAL LAND MANAGEMENT STATUTES.

40.    The MLA authorizes and governs the leasing of public lands for the production of coal and other minerals. Pursuant to the MLA, the Secretary of the Interior is authorized to lease coal on public lands "as he finds appropriate and in the public interest," provided that every sale is made by competitive bid and provides the public with fair market value. *See* 30 U.S.C. § 201(a)(1). The MLA further requires that the Secretary only lease coal in a manner that balances "long-term benefits to the public against short-term benefits." *Id*. § 201(a)(3). BLM is the federal agency within the Department of the Interior tasked with administering the federal coal leasing program.

41.   FLPMA establishes the broad framework under which BLM manages public lands for multiple uses in a way "that will best meet the present and future needs of the American people."  43 U.S.C. § 1702(c); *see id.* § 1712(c)(7) (in developing land use plans, BLM must "weigh long-term benefits to the public against short-term benefits").  Under FLPMA, Congress declared that it is the policy of the United States that "public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."  *Id*. § 1701(a)(8).  FLPMA also requires that BLM "receive fair market value of the use of the public lands and their resources."  *Id*. § 1701(a)(9).

## III.   ADMINISTRATIVE PROCEDURE ACT.

42.   Pursuant to the APA, a reviewing court shall "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, otherwise no in accordance with law; [or] without observance of procedure required by law."  5 U.S.C. § 706.  The APA defines "agency action" to include "the whole or a part of an *agency* rule, *order*, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Id*. § 551(13) (emphases added); *see id*. § 551(6) (defining "order" to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing").

43.   These core principles apply to an agency's decision to change existing policy.  *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 513–15 (2009).  While an agency need not show that a new policy is "better" than the policy it replaced, it still must demonstrate that "it is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates."  *Id.* at 515 (emphases omitted).  Further, an

agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* Any "[u]nexplained inconsistency" between a new policy and its prior version is "a reason for holding an [agency's] interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    THE FEDERAL COAL LEASING PROGRAM.

44.    The United States has the largest demonstrated coal reserves in the world, with an estimated 477 billion tons of coal, 255 billion tons of which is deemed recoverable.  The United States is the second largest coal producer in the world behind China.  In 2015, 42 percent of all coal produced in the United States came from public lands.

45.    BLM is the federal agency charged with managing coal resources on 570 million acres of public lands where the mineral estate is owned by the federal government.  Currently, BLM oversees 299 coal leases encompassing 458,636 acres in 12 states, with an estimated 6.5 billion tons of recoverable Federal coal reserves.  Federal coal from the Powder River Basin in Montana and Wyoming accounts for over 85 percent of this production.  Between 2009 and 2018, BLM held 21 coal lease sales and managed leases that produced approximately 3.9 billion tons of coal and $9.81 billion in royalty revenue.

46.    According to the most recent publicly available BLM data, as of 2017 there were 21 active federal coal leases in New Mexico, encompassing 42,196 acres.  This is approximately 9% of the acres under federal coal leases nationwide. In 2018, New Mexico produced 10,792,000 short tons of coal, fourteenth in the nation.

47.     According to BLM data, in New Mexico there are 21 federal coal leases, encompassing 42,756 acres.  This is nearly 9% of the 482,691 acres under federal coal leases nationwide.  According to the New Mexico Bureau of Geology and Mineral Resources, New Mexico ranks 12th in the nation in coal production.

48.     The majority of federal coal is used to generate electricity domestically, accounting for an estimated 14 percent of the Nation's electricity in 2015 and 11 percent of total U.S. greenhouse gas emissions.  Coal is also used for other processes, including making steel (i.e., metallurgical coal).  In 2015, about 8 percent of all U.S. coal was exported, and many coal companies are attempting to expand exports in the face of decreasing domestic demand, including a proposal to construct a new bulk export terminal at the former Oakland Army Base in Oakland, California.  The transport, storage, and handling of such coal results in particulate matter emissions that have been shown to cause numerous environmental and public health concerns.

49.     BLM manages federal coal pursuant to regulations and a programmatic EIS that were originally adopted 41 years ago, at a time when the threat of climate change was not fully appreciated and market conditions, infrastructure development, scientific understanding, and national priorities were dramatically different.  *See* 44 Fed. Reg. 42,584 (July 19, 1979) (Coal Management; Federally Owned Coal); BLM, Final Programmatic Environmental Statement:  Federal Coal Management Program) ("1979 PEIS").  The 1979 PEIS does not consider the climate impacts of the federal coal program or adequately evaluate other potential environmental effects, let alone reflect the conditions of the coal industry as it exists today.

50.     The programmatic EIS was last revisited in 1985 when BLM updated its coal leasing regulations and completed a limited supplement to the 1979 PEIS in response to recommendations from the Commission on Fair Market Value Policy

for Federal Coal Leasing that addressed continued irregularities in the leasing process ("1985 Supplement"). While the 1979 PEIS analyzed seven major alternative coal programs, the 1985 Supplement examined only the continuation of the federal coal program and three alternatives: (1) Leasing by Application, (2) Preference Right and Emergency Leasing, and (3) No New Federal Leasing, *i.e.*, the no action alternative. The 1985 Supplement fails to mention, let alone consider and evaluate, climate change impacts. BLM's revised regulations incorporated a two-tiered leasing structure. First, in certified coal producing regions where exploration and new mining were occurring, BLM would select tracts for lease sale. Second, in areas outside of the coal producing regions, mining companies would apply for specific tracts of lands to be leased, generally adjacent to their existing mines.

51.    However, between 1987 and 1990, all six certified coal-producing regions were "decertified" by BLM for various reasons, which had the effect of making all federal coal leasing happen by industry application. Reliance on leasing by application substantially impairs the efficacy of competitive lease auctions. Existing lease holders have a financial incentive to submit applications that propose tracts adjacent to their existing leases. Since coal mining operations are capital-intensive and mining equipment is logistically difficult to move, bidders closest to a proposed lease can generally outbid all other parties. The result is that leasing by application auctions frequently have only one bidder and are effectively noncompetitive, a result that was not contemplated when the current program was structured.

## II.   RECENT REVIEW OF THE FEDERAL COAL PROGRAM.

52.    In recent years, Congress and government watchdogs have criticized BLM's outdated structure for management of federal coal. Addressing the statutory "fair market value" leasing standard under the MLA, the Department's Office of the

Inspector General in 2013 issued a report concluding that "BLM faces significant challenges in the areas of coal leasing and mine inspection and enforcement" and that its management resulted in millions of dollars in lost royalties to the federal treasury because the agency was "not receiving the full, fair market value for the leases." Off. of the Inspector Gen., U.S. Dep't of the Interior, Coal Management Program, U.S. Department of the Interior (June 2013), *available at*: https://www.doioig.gov/sites/doioig.gov/files/CR-EV-BLM-0001-2012Public.pdf. The Inspector General made several recommendations necessary to "enhance [BLM's] coal management program significantly" and recover these lost revenues.

53.    Also in 2013, the Government Accountability Office ("GAO") concluded that BLM had failed to ensure mining companies pay fair market value for leasing federal coal. U.S. Gov't Accountability Off., GAO-14-140, Coal Leasing: BLM Could Enhance Appraisal Process, More Explicitly Consider Coal Exports, and Provide More Public Information 15 (Dec. 2013), *available at*: http://www.gao.gov/products/GAO-14-140. GAO determined that since 1990, "most" federal coal leases were not sold competitively and had only a single bidder. In particular, of the 107 tracts that were leased between 1990 and 2012, "sales for 96 (about 90 percent) involved a single bidder … which was generally the company that submitted the lease application. More than 90 percent of the lease applications BLM received were for maintenance tracts used to extend the life of an existing mine or to expand that mine's annual production."

III. **PRIOR ACTIONS BY THE INTERIOR DEPARTMENT TO IMPROVE THE FEDERAL COAL PROGRAM.**

54.    On March 17, 2015, due to these concerns and others raised by members of Congress, interested stakeholders, and the public, then-Secretary of the Interior Sally Jewell called for "an honest and open conversation about modernizing the Federal coal program." The Department of the Interior subsequently held listening sessions around the country that summer. The Department heard from 289

individuals during the sessions and received over 94,000 written comments.  The oral and written comments reflected several recurring concerns, in particular, that American taxpayers are not receiving a fair return for the leasing of public coal resources; that the Federal coal program conflicts with the Administration's climate policy and the country's national climate goals; and about the structure of the Federal coal program in light of current market conditions, including how implementation of the Federal leasing program affects current and future coal markets, coal-dependent communities and companies, and the reclamation of mined lands.

55.    On January 15, 2016, Secretary Jewell issued Secretarial Order 3338 commencing a process to prepare a new programmatic EIS of the federal coal program and establishing a moratorium on most new leasing activity until completion of that review.  *See* Secretarial Order No. 3338, Discretionary Programmatic Environmental Impact Statement to Modernize the Federal Coal Program (Jan. 15, 2016) ("Secretarial Order 3338"), *available at*: http://elips.doi.gov/ELIPS/0/doc/4271/Page1.aspx.

56.    Secretarial Order 3338 cited the Defendants' legal obligations "to ensure conservation of the public lands, the protection of their scientific, historic, and environmental values, and compliance with applicable environmental laws" as well as Defendants' "statutory duty to ensure a fair return to the taxpayer."  In determining that it was appropriate to suspend the issuance of new federal coal leases while BLM undertook a comprehensive review, the Secretary explained:

> Lease sales and lease modifications result in lease terms of 20 years and for so long thereafter as coal is produced in commercial quantities.  Continuing to conduct lease sales or approve lease modifications during this programmatic review risks locking in for decades the future development of large quantities of coal under current rates and terms that the PEIS may ultimately determine to be less than optimal.

57.    Under NEPA, early in the preparation of an EIS, an agency undertakes a process known as scoping.  40 C.F.R. § 1501.7; 43 C.F.R. § 46.235.  In the scoping process, the agency describes a proposed agency action and possible alternatives, and seeks input from States, tribes, local governments, and the public on the affected resources and the environmental issues raised by the proposed action to help evaluate what issues the agency should address in the EIS.

58.    In March 2016, BLM began a scoping process by issuing a Notice of Intent to Prepare a Programmatic Environmental Impact Statement to Review the Federal Coal Program and to Conduct Public Scoping Meetings.  81 Fed. Reg. 17,720 (Mar. 30, 2016).  During the spring and summer of 2016, BLM accepted more than 214,000 public comments and held six public meetings in various cities regarding its review of the federal coal program.

59.    On January 11, 2017, BLM released its Scoping Report on the federal coal program in which it found that "modernization of the Federal coal program is warranted."  BLM stated that "[t]his modernization should focus on ensuring a fair return to Americans for the sale of their public coal resources; addressing the coal program's impact on the challenge of climate change; and improving the structure and efficiency of the coal program in light of current market conditions, including impacts on communities."  BLM further found that "key areas of analysis for the PEIS, many of which were identified as priorities by the Secretarial Order, include: return to the taxpayer, climate impacts/greenhouse gas emissions, socioeconomic considerations, energy needs (including coal production and exports, as well as substitution effects), energy prices, other environmental impacts (e.g., water quality and wildlife), and health impacts."

60.    In particular, with regard to climate change, BLM noted that U.S. federal coal production and combustion were responsible for about 11 percent of U.S. greenhouse gas emissions.  The agency stated that climate change caused by human

emission of greenhouse gases threatens public health and welfare in many ways, including increased heat waves, more frequent and intense storms, reduced water supplies, increase wildfires, flooding, and sea level rise.  BLM acknowledged it thus has a legal obligation to consider these issues: "Consideration of the implications of Federal coal leasing for climate change, as an extensively documented threat to the health and welfare of the American people, falls squarely within the factors to be considered in determining the public interest."

61.    In addition to addressing climate change, several other factors not adequately considered in the 1979 PEIS or 1985 Supplement warrant supplemental environmental review.  These include harm to public lands and wildlife from coal mining, air quality impacts from coal transport and combustion, and the disposal of coal ash, which contains hazardous constituents.  Moreover, the environmental justice impacts related to coal mining and downstream activities such as coal transport and export have never been adequately considered.

62.    Furthermore, BLM recognized several significant changes in the coal industry during the past few decades that must be addressed.  For example, coal has fallen out of favor for electricity production domestically.  According to BLM, "there has been a consistent decline in coal-fired electricity generation," which made up 50% of U.S. generation in 2005 but fell to 33% in 2015 and is now forecasted to fall to 18% in 2020.  Coal production fell from 1.13 billion tons to less than 0.9 billion tons during the 2005-2015 period, and was forecast to fall even further in future years.  BLM noted several reasons for this softening market and decease in coal-fired generating capacity, including the decrease in natural gas prices and the aging coal fleet, among others.  In addition, BLM found that "[r]enewable energy, such as wind and solar, have also become more cost competitive and widely available over the past 5 years."  As a result, U.S. coal resources are increasingly being shipped and consumed abroad, and American

residents – while bearing the many external costs of the program – do not enjoy the concomitant benefits.

63.     Finally, as discussed above, the federal coal leasing program has failed to fulfill legal mandates to ensure a fair economic return to American taxpayers due to changes in the federal coal leasing process.

64.     As BLM summarized in the Scoping Report, "[t]he last time the Federal coal program received a comprehensive review was in the mid-1980s, and most of the existing regulations were promulgated in the late 1970s and have been only slightly modified since that time.  The direct, indirect, and cumulative impacts of the Federal coal program have not been fully analyzed under the National Environmental Policy Act (NEPA) in over thirty years."

65.     Consequently, BLM stated that it would move forward with the preparation of a draft programmatic EIS by January 2018 regarding the modernization of the federal coal leasing program using the information received during the scoping process, and would issue a final PEIS by January 2019.

**IV.   PRESIDENT TRUMP'S EXECUTIVE ORDER AND SECRETARIAL ORDER 3348.**

66.     On March 28, 2017, President Donald Trump issued an Executive Order entitled "Promoting Energy Independence and Economic Growth" ("Executive Order").  82 Fed. Reg. 16,093 (Mar. 31, 2017).  Among other provisions, the Executive Order stated: "The Secretary of the Interior shall take all steps necessary and appropriate to amend or withdraw Secretary's Order 3338 dated January 15, 2016 (Discretionary Programmatic Environmental Impact Statement (PEIS) to Modernize the Federal Coal Program), and to lift any and all moratoria on Federal land coal leasing activities related to Order 3338.  The Secretary shall commence Federal coal leasing activities consistent with all applicable laws and regulations." *Id*. at 16,096.

67.    On March 29, 2017, Secretary of the Interior Ryan Zinke issued Secretarial Order 3348, entitled "Concerning the Federal Coal Moratorium," which revoked Order 3338, restarted the federal coal leasing program, and terminated the environmental review process.  Specifically, Secretarial Order 3348 noted that the PEIS "is estimated to cost many millions of dollars and would be completed no sooner than 2019, even with robust funding."  Secretarial Order 3348 stated that "the public interest is not served by halting the Federal coal program for an extended time, nor is a PEIS required to consider potential improvements to the program."  Secretarial Order 3348 then directed BLM "to process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of Secretary's Order 3338," and commanded that "[a]ll activities associated with the preparation of the Federal Coal Program PEIS shall cease."  Secretarial Order 3348 stated that it is "effective immediately."

## V.    THE LITIGATION AND BLM'S PREPARATION OF AN EA.

68.    On May 9, 2017, Plaintiffs filed an action in this Court challenging Defendants' decision to restart the federal coal leasing program without conducting any environmental review under NEPA, and without considering whether the program is in the public interest or if it will provide fair market value to the public, in violation of the MLA and FLPMA.  *State of California, et al., v. Zinke*, Case No. CV-17-42-GF-BMM (complaint filed May 9, 2017).  The case was consolidated with an earlier-filed action by citizen and tribal groups.  *Citizens for Clean Energy, et al. v. U.S. Department of the Interior, et al*., Case No. CV-17-30-GF-BMM (complaint filed Mar. 29, 2017).

69.    Following briefing on cross-motions for summary judgment, this Court issued an order granting in part and denying in part the motions on April 19, 2019.  ECF No. 141.  In particular, the Court found that Secretarial Order 3348 constituted a "major federal action" subject to the requirements of NEPA.  *Citizens for Clean*

*Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264 (D. Mont. 2019).  The Court determined that it could not decide Plaintiffs' MLA and FLPMA claims "until Federal Defendants have completed their environmental review."  The Court ordered the parties to meet and confer regarding the appropriate remedy for the NEPA violation and, if no agreement could be reached, to submit additional briefing on this issue.

70.    On May 22, 2019, BLM issued a 35-page Draft Environmental Assessment ("Draft EA") which purported "to be responsive to" the Court's ruling. However, the Draft EA limited its analysis to just three leases that were issued since Secretarial Order 3348 was signed in March 2017.  These three leases are (1) the Alton Coal Tract Lease by Application; (2) Pollyanna 8 Coal Lease; and (3) the South Fork Federal Coal Lease Modification.  According to BLM, these "three non-exempt leases and their respective issue dates represent the universe of lease issuances traceable to the [Secretarial Order 3348's] resumption of normal leasing procedures."

71.    The Draft EA considered only two alternatives: (1) Alternative 1, the "No Action Alternative," which assumes that Secretarial Order 3338 would have remained in place for an additional 24 months, until March 2019; and (2) Alternative 2, entitled "Resume Normal Leasing Procedures in March 2017," which considers BLM's processing of new lease application in the 24 months since March 2017.  BLM assumed that the only difference between the two alternatives was that Alternative 2 would cause environmental impacts earlier than Alternative 1.

72.    With regard to the environmental effects, the Draft EA summarized portions of already-completed NEPA reviews for the three leases and with regard to just three "issues": (1) greenhouse gas emissions; (2) socioeconomic impacts; and (3) impacts to water quality, quantity, and riparian areas.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

73.    BLM allowed only a 19-day period to submit comments on the Draft EA. Plaintiffs submitted comments on June 10, 2019, contending that the Draft EA improperly limited the scope of the NEPA review, failed to consider reasonable alternatives to the proposed action, and failed to consider the environmental impacts of restarting the federal coal leasing program, among other arguments.

74.    BLM represented to the Court that it would complete its environmental review by "early July" 2019.  However, BLM failed to complete this review before the parties submitted their remedy briefs on July 22, 2019, as ordered by the Court.

75.    In their July 22, 2019 remedy brief, Plaintiffs requested that the Court implement the standard remedy for violations of NEPA by vacating Secretarial Order 3348, s*ee* 5 U.S.C. § 706(2)(A), given that the Draft EA was facially insufficient to redress the NEPA violation found by the Court.  BLM argued in its remedy brief that the Court should postpone any decision on remedy until the conclusion of its NEPA process, which they expected to complete by August 5, 2019.

76.    On July 31, 2019, based on BLM's representations, the Court concluded that it was "appropriate to postpone a remedies ruling until after Federal Defendants' completion of their NEPA review."  ECF No. 150 at 5.  The Court further stated that "[t]he parties shall reserve their rights set forth in the Court's Summary Judgment Order (Doc. 141) to file briefs within the word limits determined by the Court."  *Id.*

77.    Seven months later, on February 26, 2020, BLM issued the Final EA and FONSI, which remained largely unchanged from the Draft EA with the addition of one lease modification (the 170-acre South Fork Federal Coal Lease Modification (SUFCO) (U-63214)) that was reclassified from exempt to non-exempt under Secretarial Order 3338  In particular, the Final EA cursorily evaluated only four leases that BLM issued between March 2017 and March 2019 which the agency

claimed would not have been issued but for Secretarial Order 3348, and did not consider any future leasing.  The Final EA evaluated just two alternatives: (1) a "no action alternative" that assumed Secretarial Order 3338 would have simply delayed the federal coal leasing program for 24 months; and (2) the "action alternative" which considered BLM's processing of new lease applications in this 24-month time period.  The Final EA considered only the effects of these four leases with regard to greenhouse gas emissions, socioeconomic impacts, and impacts to water quality, quantity, and riparian areas.  In the Final EA and FONSI, BLM continued to dispute NEPA's application to the issuance of Secretarial Order 3348, despite this Court's holding to the contrary.

78.    Plaintiffs filed a substitute remedy brief on March 10, 2020, again requesting that the Court vacate Secretarial Order 3348 because the Final EA and FONSI did not remedy the NEPA violation found by the Court.  BLM argued that the remedy for its NEPA violation had now been completed, and that "[a]ny claims concerning the legal adequacy of the EA and FONSI must be brought through a new or supplemental complaint."

79.    On May 22, 2020, the Court denied Plaintiffs' request to vacate Secretarial Order 3348, finding that BLM has "remedied the violation specified in the Court's Order (failure to initiate NEPA analysis) and any challenge to the EA and the FONSI is not appropriately before the Court.  Plaintiffs remain free to file a complaint to challenge the sufficiency of the EA and FONSI."  ECF No. 170.

**FIRST CLAIM FOR RELIEF**

**(Violations of NEPA and the APA:**

**Improper Scope of NEPA Analysis**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.25; 5 U.S.C. § 706)**

80.    Paragraphs 1 through 79 are realleged and incorporated herein by reference.

81.    NEPA requires that an agency consider the full scope of activities encompassed by its Proposed Action.  *See* 40 C.F.R. § 1508.25.  This includes a consideration of connected, cumulative, and similar actions, all reasonable alternatives, as well as all direct, indirect, and cumulative impacts of a proposal.  *Id*. "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration."  *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (internal quotation marks omitted).

82.    "Connected actions" means actions that "are closely related and therefore should be discussed in the same impact statement."  40 C.F.R. § 1508.25(a)(1). Connected actions must be considered together in order to preclude an agency from "divid[ing] a project into several smaller actions, each of which might have an insignificant environmental impact when considered in isolation, but which taken as a whole have a substantial impact."  *Northwest Resource Info. Ctr., Inc. v. National Marine Fisheries Serv.*, 56 F.3d 1060, 1068 (9th Cir. 1995).  Similarly, "cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement."  40 C.F.R. § 1508.25(a)(2).  Moreover, "similar actions" are actions "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  40 C.F.R. § 1508.25(a)(3).

83.    Here, the Final EA does not attempt to analyze the environmental impacts of the federal coal leasing program.  Instead, BLM impermissibly restricted the scope of its analysis to cover just four federal coal leases that were issued during the 24 months between the March 29, 2017 date of Secretarial Order 3348

and the "anticipated date" that the moratorium would have been lifted.  BLM had no legitimate basis for limiting the scope of its NEPA review.  Secretarial Order 3348 applies to *all* future BLM leasing decisions, *i.e.*, the entirety of the federal coal leasing program, not merely a small subset of lease applications that were impacted by the moratorium prior to its termination.  As the U.S. Supreme Court has found, the federal coal leasing program "is a coherent plan of national scope, and its adoption surely has significant environmental consequences."  *Kleppe*, 427 U.S. at 400.

84.    Secretarial Order 3348's text confirms its broad application to the federal coal leasing program, not just a handful of leases.  For example, in Section 1, the Secretary stated that "this Order directs efforts to enhance and improve the Federal coal leasing program."  Similarly, in Section 5, the Secretary stated that "BLM is directed to process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of Secretary's Order 3338."  Neither of these directives are limited to a subset of the program or a few leases, as BLM claimed in the Final EA.

85.    As BLM acknowledged in the Final EA, the scope of the federal coal leasing program is broad:  "As of Fiscal Year 2018, the BLM administered 299 Federal coal leases, encompassing 458,636 acres in 12 states, with an estimated 6.5 billion tons of recoverable Federal coal reserves."  Moreover, there are dozens of other lease applications pending with BLM that represent connected or cumulative actions that must be included in any NEPA analysis.  These activities, as well as any reasonably foreseeable future actions related to the program, should have been included within the scope of the Final EA.  BLM had no basis for limiting the environmental review to just four leases when Secretarial Order 3348 opens the door to leasing generally, for decades to come.

86.    Defendants' decision to issue Secretarial Order 3348 to restart the federal coal leasing program without preparing a NEPA document that evaluates the full scope of activities of that action was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.25; 5 U.S.C. § 706(2).  Consequently, Secretarial Order 3348 should be held unlawful and set aside.

**SECOND CLAIM FOR RELIEF**

**(Violations of NEPA and the APA:**

**Failure to Consider Reasonable Alternatives**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9; 5 U.S.C. § 706)**

87.    Paragraphs 1 through 86 are realleged and incorporated herein by reference.

88.    NEPA requires that Defendants provide a "detailed statement" regarding the "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. §§ 1508.9(b), 1502.14(a).  The requirement to consider reasonable alternatives "lies at the heart of any NEPA analysis."  *California ex rel. Lockyer v. U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006).  Agencies must "rigorously explore and objectively evaluate all reasonable alternatives" to a proposed action, and briefly discuss the reasons for eliminating any alternatives from detailed study.  40 C.F.R. § 1502.14(a).  "The existence of a viable but unexamined alternative renders" an EIS inadequate.  *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (internal quotations and citations omitted).

89.    Here, the Final EA considered just two alternatives: (1) a "no action alternative" that assumed Secretarial Order 3338 would have simply delayed the federal coal leasing program for 24 months, and (2) the "action alternative" which evaluated BLM's processing of four new lease applications in this 24-month time

period.  BLM assumed that the only difference between these two alternatives was that Alternative 2 would cause environmental impacts earlier that Alternative 1.

90.   This analysis is fundamentally flawed and contrary to NEPA.  In particular, the lack of any meaningful difference between the alternatives did not allow for informed decision making or public participation in evaluating the impacts of the federal coal leasing program.  *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (federal agency violated NEPA where two action alternatives considered were "virtually identical").

91.   Moreover, BLM's narrow analysis ignored without explanation several reasonable alternatives for the federal coal leasing program that BLM previous identified in its January 2017 Scoping Report to ensure a fair return to Americans for the sale of their public coal resources; reduce the impacts with regard to climate change and other environmental issues; and provide for more efficient administration of the program in light of current market conditions, including impacts on communities.

92.   For example, to reduce greenhouse gas emissions, BLM identified potential alternatives such as (1) accounting for carbon-based externalities through a royalty rate increase or royalty adder; (2) adopting requirements for the use of compensatory mitigation; (3) establishing a carbon budget to guide federal coal leasing in an effort to limit the amount of greenhouse gas emissions associated with federal coal production; (4) considering opportunities to address methane emissions associated with coal mining operations; and (5) fully analyzing a no new leasing alternative.  The Final EA failed to consider any of these reasonable alternatives.

93.   Defendants' failure to consider reasonable alternatives in the Final EA is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9; 5 U.S.C. §

706(2).  Consequently, Secretarial Order 3348 should be held unlawful and set aside.

### THIRD CLAIM FOR RELIEF

### (Violations of NEPA and the APA:

### Failure to Take a "Hard Look" at Environmental Impacts

### 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706)

94.    Paragraphs 1 through 93 are realleged and incorporated herein by reference.

95.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action.  *See* 42 U.S.C. § 4332.  To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  *Id*. § 4332(2)(C); 40 C.F.R. § 1502.3.  A federal agency must analyze the direct, indirect, and cumulative impacts of its action.  *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8.

96.    To determine whether a proposed project may significantly affect the environment, NEPA requires that both the context and the intensity of an action be considered.  40 C.F.R. § 1508.27.  In evaluating the context, "[s]ignificance varies with the setting of the proposed action" and includes an examination of "the affected region, the affected interests, and the locality."  *Id*. § 1508.27(a).  Intensity "refers to the severity of impact," and NEPA's implementing regulations list ten factors to be considered in evaluating intensity, including "[u]nique characteristics of the geographic area such as proximity to ... ecologically critical areas," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may adversely affect an endangered or threatened

species or its habitat that has been determined to be critical under the Endangered Species Act," and "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." *Id*. § 1508.27(b).  The presence of just "one of these factors may be sufficient to require the preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

97.    An agency may decide to prepare an environmental assessment ("EA") to determine whether the effects of an action may be significant.  40 C.F.R. § 1508.9.  An EA must also discuss the "environmental impacts of the proposed action" and "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  *Id*. § 1508.9(a)–(b); *see id*. § 1500.1(b).  If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons to explain why a project's impacts are insignificant."  *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 730.

98.    Secretarial Order 3348, which revoked Secretarial Order 3338 and restarted the federal coal leasing program, constituted a major federal action subject to NEPA.  *Citizens*, 384 F. Supp. 3d at 1279 (Secretarial Order 3348 "constitutes a major federal action sufficient to trigger NEPA").  However, the Final EA and FONSI prepared by BLM did not consider the environmental impacts of restarting the federal coal leasing program.  Instead, the Final EA limited its consideration of impacts from just four leases issued since March 2017 and evaluates only three issues:  greenhouse gas emissions, socioeconomic impacts, and impacts to water quality, quantity, and riparian areas.

99.    In doing so, the Final EA completely ignored other potentially significant impacts associated with the federal coal leasing program.  These impacts include harm to public lands and wildlife from coal mining, air quality impacts from coal

transport and combustion, the disposal of coal ash, impacts to environmental justice communities, and the cumulative climate change impacts from the federal coal leasing program, which BLM previously found accounts for 11 percent of total U.S. greenhouse gas emissions.

100.  For example, the shipment of coal from mining sites in Montana and Wyoming to west coast ports in open top train cars has significant negative impacts on local air quality and the environment, due to the release of particulate matter pollution and toxic materials.  The transport, warehousing, and loading of coal for export also has negative health consequences for workers and nearby communities exposed to coal dust from such operations.

101.  Moreover, even with regard to the three issues that the Final EA does address, BLM's analysis is superficial and insufficient.  For example, with regard to impacts to water quality, quantity, and riparian areas, BLM summarized the conclusions of existing NEPA reviews for each of the four leases, and then summarily claimed that cumulative effects "are not anticipated because there is no hydrologic connection between water resources or riparian areas of the four locations."

102.  On climate change, BLM's consideration of just four leases represents only a small fraction of the significant environmental impacts from the federal coal leasing program.  With regard to cumulative impacts, which considered a broader range of 57 federal coal lease applications either received or pending since the issuance of Secretarial Order 3338, BLM simply assumed that greenhouse gas emissions would occur earlier under Secretarial Order 3348.  Moreover, BLM completely ignored many other active coal leases as well as reasonably foreseeable future actions that would result in additional cumulative impacts.

103.  In addition, the Final EA arbitrarily refused to use the social cost of carbon—or any other meaningful metric—to accurately assess the greenhouse gas impacts of the action.

104.  With regard to socioeconomic impacts, BLM found no such impacts because "each of the four coal leases issued already had sufficient reserves to continue operations through March 2019" and "would have been able to continue producing" under both alternatives.  For eight other pending leases, BLM simply stated that the socioeconomic impacts "are too speculative to ascertain with any meaningful precision."

105.  Defendants' decision to issue Secretarial Order 3348 to restart the federal coal leasing program without preparing a NEPA document that takes a "hard look" at the environmental impacts of the program was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA, and accordingly violated NEPA and the APA.  42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2).  Consequently, Secretarial Order 3348 should be held unlawful and set aside.

**FOURTH CLAIM FOR RELIEF**

**(Undertaking Federal Coal Leasing in Violation of the MLA and the APA; 30 U.S.C. § 201(a)(1), (3); 5 U.S.C. § 706)**

106.  Paragraphs 1 through 105 are realleged and incorporated herein by reference.

107.  The MLA authorizes the Secretary of the Interior to lease the production of coal on public lands if it is "in the public interest."  30 U.S.C. § 201(a)(1).  The MLA further requires that every sale of such mineral be made by competitive bid and provide the public with "fair market value."  *Id*.  The Secretary may only lease coal in a manner that balances "long-term benefits to the public against short-term benefits."  *Id*. § 201(a)(3).

108.  Prior to the issuance of Secretarial Order 3348, Defendants failed to complete an environmental review that identified and evaluated the numerous impacts of the federal coal leasing program or the public interest and long-term benefits of ending or limiting the scope of the program.  The public interest includes consideration of environmental effects of a planned leasing program.  Moreover, there are significant long-term benefits to the public in addressing climate change and other environmental impacts of coal leasing.  These impacts include, but are not limited to, avoiding, reducing, or mitigating the effect of the coal leasing program on climate change, air quality, environmental justice, and other environmental problems.  There are also significant long-term benefits to the public in ensuring a fair return to Americans for the sale of public coal resources.  Defendants' current management of the federal coal leasing program fails to provide the public with "fair market value" for the sale of these public resources.  The Final EA and FONSI issued by Defendants in February 2020 did not provide any consideration of this issue.

109.  Defendants' decision to issue Secretarial Order 3348 to undertake federal coal leasing was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of the MLA and the APA, and accordingly violated the MLA and the APA.  30 U.S.C. § 201(a)(1), (3); 5 U.S.C. § 706(2).  Consequently, Secretarial Order 3348 should be held unlawful and set aside.

### FIFTH CLAIM FOR RELIEF

### (Undertaking Federal Coal Leasing in Violation of FLPMA and the APA; 43 U.S.C. § 1701(a); 5 U.S.C. § 706)

110. Paragraphs 1 through 109 are realleged and incorporated herein by reference.

111. In managing public lands for multiple uses, FLPMA requires that Defendants manage such lands "in a manner that will protect the quality of

scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values," and that Defendants "receive fair market value of the use of the public lands and their resources."  43 U.S.C. § 1701(a)(8)-(9).

112. Prior to the issuance of Secretarial Order 3348, Defendants failed to complete an environmental review that would evaluate whether public lands subject to the federal coal leasing program are being managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.  Defendants' current management of the federal coal leasing program also fails to provide the public with "fair market value" for the sale of these public resources.  The Final EA and FONSI issued by Defendants in February 2020 did not provide any consideration of this issue.

113. Defendants' decision to issue Secretarial Order 3348 to undertake federal coal leasing was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of FLPMA and the APA, and accordingly violated FLPMA and the APA.  43 U.S.C. § 1701(a); 5 U.S.C. § 706(2).  Consequently, Secretarial Order 3348 should be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that Defendants acted arbitrarily, capriciously, and contrary to law, abused their discretion, and failed to follow the procedure required by law in their issuance of Secretarial Order 3348, in violation of NEPA, the MLA, FLPMA, and the APA;

2.    Issue an order requiring Defendants to vacate and set aside Secretarial Order 3348 for failure to comply with NEPA, the MLA, FLPMA, and the APA;

3.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees;

4.    Award such other relief as the Court deems just and proper.

Dated:  July 20, 2020               Respectfully submitted,

/s/ Roger Sullivan
ROGER SULLIVAN
DUSTIN LEFTRIDGE
McGarvey, Heberling, Sullivan &
Lacey, P.C.
345 1st Ave. E.
Kalispell, Montana 59901-5341
(406) 752-5566
RSullivan@McGarveyLaw.com

*Attorneys for Plaintiffs*

XAVIER BECERRA
Attorney General of California
DAVID ZONANA
Supervising Deputy Attorney General

/s/ George Torgun
GEORGE TORGUN (*pro hac vice*)
CA Bar No. 222085
ELIZABETH B. RUMSEY (*pro hac vice*)
CA Bar No. 257908
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA  94612-0550
Telephone:  (510) 879-1002
E-mail:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiff State of California*

HECTOR BALDERAS
Attorney General of New Mexico

/s/Bill Grantham
BILL GRANTHAM (*pro hac vice*)
Assistant Attorney General
201 Third St. NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 717-3520
wgrantham@nmag.gov

*Attorneys for Plaintiff State of New Mexico*

1

2

LETITIA JAMES
Attorney General of New York

 /s/ Andrew G. Frank

3

ANDREW G. FRANK (*pro hac vice*)
Assistant Attorney General

4

New York Attorney General's Office
28 Liberty Street

5

New York, NY 10005
Telephone: 212-416-8271

6

Email: andrew.frank@ag.ny.gov

7

*Attorneys for Plaintiff State of New York*

8

9

ROBERT W. FERGUSON
Attorney General of Washington

10

 /s/ William R. Sherman

11

WILLIAM R. SHERMAN (*pro hac vice*)
Assistant Attorney General

12

AURORA JANKE, MT Bar No. 39522610
Assistant Attorney General

13

800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188

14

Telephone: (206) 442-4485
Email: bill.sherman@atg.wa.gov

15

          aurora.janke@atg.wa.gov

16

*Attorneys for Plaintiff State of
Washington*

17

18

19

20

21

22

23

24

25

26

27

28